# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**NATIONAL CASUALTY COMPANY**,

    Plaintiff,

vs.            No.   **CIV 00-1381 MCA/WWD** (ACE)

**HOWARD E. TATE**, d/b/a
**TATE TRUCKING AND LOGGING**,
**DORLINDA VALDEZ**, Personal Representative of
**THE ESTATE OF ANNETTE GONZALES**, and
**MARIA S. SALAZAR**, Personal Representative of
**THE ESTATE OF EMILY J. BACA**,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiff's Motion for Summary Judgment* [Doc. No. 62] filed on December 14, 2001, and the *Motion for Summary Judgment by Defendants Valdez and Salazar* [Doc. No. 73] filed on February 28, 2002. Having considered the pleadings of record, the relevant law, the arguments of counsel, and otherwise being fully advised in the premises, the Court finds that there are genuine issues of material fact which preclude summary judgment for either movant at this time. Accordingly, both motions are **DENIED**.

## I. BACKGROUND

This case arises from a dispute over whether Defendant Howard E. Tate's logging truck was covered by an automobile insurance policy issued by Plaintiff National Casualty Company at the time the truck was involved in an accident that resulted in the deaths of Annette Gonzales and Emily J. Baca. The estates of Ms. Gonzales and Ms. Baca are represented in this action by Dorlinda Valdez and Maria S. Salazar (hereinafter "the Personal Representatives"). For purposes of analyzing the pending summary-judgment motions, the following facts are undisputed.

A policy of insurance for Defendant Tate was in effect from August 27, 1998, until August 27, 1999, when the policy expired. Defendant Tate did not become aware that his policy had expired until approximately October 11, 1999. Once Defendant Tate discovered that his policy had expired, he specifically declined to purchase retroactive coverage for the period dating back to August 27, 1999. Between October 11, 1999, and October 19, 1999, Defendant Tate and his wife, Stephanie Tate, negotiated the terms of an insurance policy that they intended to purchase from Plaintiff through Mary Wright, an agent of Pueblo Insurance Services. (Pltf.'s Mem. ¶¶ 1-4, at 3; Defs.' Resp. at 1; Defs.' Mem. ¶¶ 1-4, at 2-3; Pltf.'s Resp. at 3.)

Stephanie Tate is disabled and cannot drive. On October 18, 1999, she gave an envelope containing a check for a premium payment to her friend, Martha Chavez, to mail to Pueblo Insurance Services. Ms. Tate expected that the check would be mailed that same

day. (Pltf.'s Mem. ¶¶ 6, at 3; Defs.' Resp. at 1; Defs.' Mem. ¶ 6, 15, at 3, 5; Pltf.'s Resp. at 3.)

Defendant Tate suffered a loss on October 19, 1999, at approximately 11:02 a.m., when his truck was involved in the accident that killed Ms. Gonzales and Ms. Baca. After the accident, Defendant Tate was arrested and taken to jail. He was not able to phone Ms. Tate and tell her about the accident until later in the evening. (Pltf.'s Mem. ¶ 5, at 3, Defs.' Resp. at 1; Defs.' Mem. ¶¶ 5, 14, at 3, 5; Pltf.'s Resp. at 3.)

On October 19, 1999, at approximately 4:00 p.m., Ms. Tate informed Ms. Wright that the premium payment had been mailed on October 18, 1999, and requested that coverage be bound on October 18, 1999. Ms. Wright filled out the insurance application using a form provided by Plaintiff. Ms. Tate returned the signed application for insurance to Ms. Wright via facsimile on October 19, 1999, at 5:01 p.m., and the envelope containing the premium payment was postmarked at 2:45 p.m. on October 19, 1999. (Pltf.'s Mem. ¶¶ 9, 10, at 3-4; Defs.' Resp. at 1; Defs.' Mem. ¶¶ 9, 10, 12, at 3; Plft.'s Resp. at 3.)

Ms. Wright was not authorized by Plaintiff to bind coverage. Rather, the authority to bind coverage resided with Plaintiff's general agent, Julie Schippers of Burns & Wilcox Ltd. Ms. Schippers never communicated directly with the Tates. Rather, Ms. Schippers communicated through Ms. Wright. Ms. Schippers issued a letter to Ms. Wright dated October 26, 1999, denying liability coverage for the loss suffered by Defendant Tate on October 19, 1999. (Defs.' Mem. ¶¶ 12, 18, at 4, 6-7; Pltf.'s Resp. at 3.)

While the parties' motions are in agreement on the above facts, they disagree as to the substance and effect of the conversations that occurred on October 19, 1999, between Ms. Tate and Ms. Wright, and between Ms. Wright and Ms. Schippers. According to Ms. Tate's deposition testimony, Ms. Wright told her to write "October 18, 1999" on the insurance application form. Ms. Tate also claims that Ms. Wright told her that coverage would apply retroactively from October 18, 1999, as soon as she signed the form and faxed it back. (Defs.' Mem. ¶ 13, at 4; S. Tate Dep. at 23.) Elsewhere in her deposition testimony, Ms. Tate claims that Ms. Wright told her: "When we get the paperwork done then you'll be covered." (S. Tate Dep. at 59.)

According to Ms. Wright's affidavit, she filled out all portions of a "Premium Finance Agreement" form, except for the signature line which states: "Howard Tate 10-18-99." Ms. Wright claims that she faxed the form to Ms. Tate on the afternoon of October 19, 1999, and instructed Ms. Tate to review, sign, and date the agreement. (Wright Aff. ¶ 4(c).)

In her affidavit, Ms. Wright further states that in a telephone call on October 19, 1999, Ms. Schippers authorized her to relay to Ms. Tate that insurance coverage would begin in accordance with the "Premium Finance Statement" and that such authorization was based on the assumption that the partial premium check in the amount of $346.75 had been placed in the U.S. mail on October 18, 1999. According to Ms. Wright's affidavit, she did not discuss with Ms. Schippers whether payment had to be mailed by a certain time of day. (Wright Aff. ¶ 5.) While Ms. Wright admits that Ms. Schippers told her that a written statement of "no loss" would be required if the policy was backdated to August 27, 1999, she

claims that Ms. Schippers did not state that a written statement of "no loss" was required if the policy was to begin on October 18, 1999. (Wright Aff. ¶ 6.)

An affidavit of Ms. Schippers also has been filed in this case. (Doc. No. 65; Ex. E to Pltf.'s Mem.] According to Ms. Schippers' affidavit, she was contacted by Ms. Wright on October 19, 1999, and during that contact, Ms. Wright inquired whether coverage could be bound for the Tate's vehicle on October 18, 1999, since Ms. Tate allegedly mailed the premium payment on that date. Ms. Schippers claims that she informed Ms. Wright that coverage could be bound on the postmark date on the envelope used to mail the premium payment if a no-loss letter could be provided. After discovering that the Tate's premium payment had been postmarked at 2:45 p.m. on October 19, 1999, and that Defendant Tate had suffered a loss prior to the mailing of the premium payment, Ms. Schippers claims that an insurance policy was offered with coverage commencing at 2:45 p.m. on October 19, 1999. (Schippers Aff. ¶¶ 3-5.) The Personal Representatives deny that Defendant Tate accepted such an offer. (Defs.' Resp. ¶ 11, at 2; Ex. A. to Pltf.'s Mem. at Req. for Admis. No. 23; Ex.C to Pltf.'s Mem. at Req. for Admis. Nos. 22 & 23.)

The Personal Representatives have submitted copies of the forms entitled "Premium Finance Agreement" and "Commercial Automobile Application" which are at issue in this case. (Ex. G, H to Defs.' Mem.) These forms contain the words "Howard Tate" and the date "10-18-99" on the signature lines, although by the parties' admissions, they were signed by Stephanie Tate on October 19, 1999. (Pltf.'s Mem. ¶ 10, at 4; Defs.' Resp. at 1; Defs.' Mem. ¶ 10, at 3; Pltf.'s Resp. at 3.) The "Premium Finance Agreement" form has the date "10-18-

99" listed in the space for "Effective Date of Policy," but language elsewhere on the form states that the insured "[a]grees that this agreement shall be effective when written acceptance is mailed to insured by PFS." (Ex. G to Defs.' Mem.) Similarly, the "Commercial Automobile Application" form lists "Oct. 18, 1999" as the "Proposed Effective Date," but language exists elsewhere on the form stating that: "This application does not bind YOU nor US to complete the insurance . . . ." (Ex. H to Defs.' Mem.)

## II.   ANALYSIS

### A.   Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). A fact is "material" if it might affect the outcome of the case. See id. at 248. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See id. at 324. Thus,

"[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995).

Apart from such limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

The same standards apply when parties file cross-motions for summary judgment. See Lenning v. Commercial Union Ins. Co., 260 F.3d 574, 581 (6th Cir. 2001). Each motion is evaluated on its own merits, and a cross-motion should be treated separately from a response to an opposing party's motion. See Administrative Order 92-88 (Separate Submissions and Docketing of Motions and Responsive Pleadings) (D.N.M. May 4, 1992). Thus, the filing of cross-motions does not necessarily mean that the matter can be resolved by a summary judgment, nor does the denial of one party's cross-motion necessarily mean that the other party's cross-motion will be granted. See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

The local rules of this Court generally provide that: "The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M. LR-Civ. 7.1(b). These local rules of procedure also

contain special provisions applicable to *pro se* parties, see, e.g., D.N.M. LR-Civ. 7.4, as well as a general provision providing for waiver of a rule by a judge "to avoid injustice," D.N.M. LR-Civ. 1.7. In this case, the Court determines that these local rules do not warrant a summary judgment at this time against Defendant Tate, who appears *pro se*, notwithstanding his failure to respond to the motions filed by Plaintiff and the Personal Representatives.

### B. Plaintiff's Motion for Summary Judgment

The central issues in this case are the timing of the formation of an insurance contract and when coverage began under that contract. Plaintiff and the Personal Representatives are in agreement that the contract into which Plaintiff and Defendant Tate entered for coverage during the period from August 27, 1998, to August 27, 1999, did not cover the loss that Defendant Tate suffered on October 19, 1999, because Defendant Tate specifically declined to purchase coverage extending from August 27, 1999, after he discovered that the policy had expired. (Pltf.'s Mem. ¶¶ 1-4; Defs.' Resp. at 1; Defs.' Mem. ¶¶ 1-4, at 2-3; Pltf.'s Resp. at 3.) They also appear to agree that, at some point, a subsequent insurance contract between Plaintiff and Defendant Tate was formed. (Pltf.'s Mem. at 9; Defs.' Resp. at 6; Defs.' Mem. at 11; Pltf.'s Resp. at 4, 9.)

Plaintiff and the Personal Representatives disagree, however, about when such a contract was formed and when coverage began under that contract. According to the Personal Representatives, the insurance contract was formed no later than October 19, 1999, and its effective date of coverage was October 18, 1999. Plaintiff, on the other hand, presents two alternative theories. Under the first theory, Plaintiff asserts that if an oral

-8-

contract was formed on October 19, 1999, then under the terms of that contract, coverage became effective no earlier than 2:45 p.m. on October 19, 1999. Under the second theory, Plaintiff asserts that no contract was formed until after October 19, 1999, when Defendant Tate allegedly accepted Plaintiff's written policy under which coverage began at 2:45 p.m. on October 19, 1999.

Plaintiff relies on two legal doctrines in support of its theories. First, Plaintiff cites the familiar doctrine that "[a] contract of insurance which has been embodied in a formal written instrument, termed a 'policy,' merges all prior or contemporaneous parol agreements touching the transaction." Western Farm Bureau Mut. Ins. Co. v. Barela, 79 N.M. 149, 151, 441 P.2d 47, 49 (1968); accord 1 Lee R. Russ & Thomas F. Segalla, Couch on Insurance (3d) §§ 13:8, 13:20, at 13-20, 13-48 (1997). It follows from this doctrine that "receipt and retention of the [written] policy without objection, by one who has had an opportunity to examine it for a reasonable time, is regarded as an acceptance of its terms." Barela, 79 N.M. at 151, 441 P.2d at 49.

Plaintiff is not entitled to summary judgment under this merger doctrine because there remain genuine issues of material fact as to whether Defendant Tate accepted or objected to the written policy under which coverage did not begin until 2:45 p.m. on October 19, 1999. (Defs.' Resp. ¶ 11, at 2; Ex. A. to Pltf.'s Mem. at Req. for Admis. No. 23; Ex.C to Pltf.'s Mem. at Req. for Admis. Nos. 22 & 23.) There also remain genuine issues of material fact as to whether Plaintiff and Ms. Tate entered into a "binder" or oral contract for temporary insurance to provide "immediate coverage in order that an insured will not remain

unprotected during the interval prior to the issuance and delivery of a policy." Ellingwood v. N.N. Investors Life Ins. Co., 111 N.M. 301, 305, 805 P.2d 70, 74 (1991).

Generally, "[a] binder may take the form of . . . a simple oral statement that the applicant is 'covered[,]'" 1 Russ & Segalla, supra, § 13:1, at 13-3, and such a statement "is binding upon the insurer even though, after an accident, the insured refuses to take the policy and pay the premium as agreed," id. § 13:1, at 13-5. Thus, it is possible for an alleged "binder" or temporary insurance contract covering the date of the loss to remain binding even if, as the Personal Representatives contend, the subsequent written policy issued by Plaintiff was not accepted by Defendant Tate without objection after the loss occurred. Disputed facts concerning this possibility preclude summary judgment in Plaintiff's favor under the merger doctrine.

Plaintiff also asserts that summary judgment is appropriate under the "known loss doctrine." Under this doctrine, "an insurer is protected from risks known to the insured prior to obtaining insurance." CPC Int'l, Inc. v. Hartford Accident & Indem. Co., 720 A.2d 408, 422 (N.J. Super. Ct. App. Div. 1998). The rationale behind the "known loss" doctrine is that "insurance policies are written to protect against uncertainties." Id.; see generally 7 Russ & Segalla, supra, § 102:7, at 102-17 ("Implicit in the concept of insurance is that the loss occur as a result of an event that is fortuitous . . . .") "If the insured knows or has reason to know, when it purchases a . . . policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss." Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1210 (Ill. 1992).

Accordingly, "[w]here the insured has evidence of a probable loss when it purchases a . . . policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the 'risk of liability is no longer unknown.'" Id. (quoting Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 63 (3d Cir. 1982)).[1]

Plaintiff is not entitled to judgment as a matter of law under the "known loss" doctrine in this case because that doctrine does not necessarily exclude from coverage all losses that occur before the formation of an insurance contract. It is possible for parties to "validly agree to antedate the coverage" when "neither is aware that a loss has occurred between the date to which the policy is backdated and the date that the insurance was actually obtained." 7 Russ & Segalla, supra, § 102:7, at 102-18. In this case, there remain genuine issues of material fact as to whether the parties agreed to antedate the coverage and whether Ms. Tate knew or had reason to know of the loss at the time of such an agreement.

Plaintiff and the Personal Representatives appear to agree that Defendant Tate was not able to phone Ms. Tate and tell her about the accident until later in the evening on October 19, 1999, after Ms. Tate's communications with Ms. Wright on that date had ended. While it is possible that Ms. Tate might have reason to know of the loss suffered by Defendant Tate by other means, the undisputed facts do not support such an inference. Thus,

---

[1] The Court does not construe Plaintiff's recitation of the "known loss" doctrine as raising the more general issue of mutual mistake-of-fact under the Restatement (Second) of Contracts §§ 152, 154 (1981). Although the evidence may suggest that Ms. Tate, Ms. Wright, and Ms. Schippers all were operating on the mistaken assumption that the check was mailed on October 18, 1999, and that no loss had occurred since that date, the legal significance of such facts, if any, was not briefed.

viewing the evidence in the light most favorable to Defendants, the Court concludes that Plaintiff is not entitled to summary judgment under the "known loss" doctrine.

### C. Personal Representatives' Motion for Summary Judgment

The legal doctrines relied upon by the Personal Representatives also do not provide grounds for summary judgment in this case. In support of their motion, the Personal Representatives rely on the proposition that "part performance by the offeree of an offer of a unilateral contract results in a contract with a condition. The condition is full performance by the offeree." Marchiondo v. Scheck, 78 N.M. 440, 443, 432 P.2d 405, 408 (1967). They also rely on the proposition that "[t]he existence of a contract does not hinge on a condition that qualifies a party's duty to perform." Western Commerce Bank v. Gillespie, 108 N.M. 535, 537, 775 P.2d 737, 739 (1989). According to the Personal Representatives, they are entitled to summary judgment under these doctrines because Ms. Tate's efforts to have a check mailed on October 18, 1999, constituted part performance on a unilateral contract, thus rendering Plaintiff's alleged offer to enter into such a contract irrevocable. In the alternative, the Personal Representatives argue that the requirement of mailing the check on October 18, 1999, was simply a condition precedent that qualified the duty to perform under the alleged contract, and thus Ms. Tate's failure to get the check mailed on that date was merely a "technical breach" which did not affect the formation or continuing viability of that contract.

The Court is unpersuaded by these arguments for the following reasons. First, the notion of part performance on a unilateral contract, to which the Personal Representatives allude, presupposes that a valid offer to enter into such a contract has been extended to the

offeree before the offeree began to perform on the contract. In this case, the undisputed facts do not show that such an offer was extended to Defendant Tate prior to the time Ms. Tate made her efforts to mail the check on October 18, 1999.

"Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." Restatement (Second) of Contracts § 33(1) (1981). Under New Mexico law, "an oral contract for insurance is effected when the parties have agreed upon (1) the subject matter, (2) the risk to be insured against, (3) the duration of the risk, (4) the amount of insurance, (5) the rate of premium, and (6) the identity of the parties." Ellingwood, 111 N.M. at 306, 805 P.2d at 75. The fact that one or more these essential terms of a proposed insurance contract "are left open or uncertain may show[s] that a manifestation of intention is not intended to be understood as an offer or as an acceptance." Restatement, supra § 33(3); cf. 1 Russ & Segalla, supra, § 13:2, at 13-8 ("[T]he delivery of provisional binders or applications to an insured does not constitute a valid contract of insurance where essential elements such as the date of the attachment of the risk, its term or duration, and the risk insured against are not ascertainable.").

When viewed in the light most favorable to Plaintiff, the evidence submitted with the briefs in this case supports a reasonable inference that Plaintiff's negotiations with Defendant Tate prior to October 19, 1999, were too indefinite to constitute an offer for a unilateral contract for coverage beginning on October 18, 1999. While there is evidence that Plaintiff's agent "quot[ed] a renewal premium for the Tate . . . insurance policy on October 11, 1999,"

-13-

(Wright Aff. ¶ 4(b)) there is also evidence that Defendant Tate rejected any offer to renew the policy retroactively from August 27, 1999. (H. Tate Dep. at 33.) The issue of when the Tates wanted coverage to begin remained unclear at least until Ms. Tate's discussions with Ms. Wright on the afternoon of October 19, 1999. Under this view of the evidence, there was no offer on which to base part performance before that time because an essential term of such an offer, namely the duration of the risk, was left open or uncertain.

The foregoing analysis also precludes summary judgment in Defendants' favor based on the theory that the mailing of the check was a condition precedent which did not affect the formation of the alleged contract. "Generally, a condition precedent is an event occurring *subsequently* to the formation of a valid contract . . . ." Gillespie, 108 N.M. at 537, 775 P.2d at 739 (emphasis added). "Whether conditions precedent are considered prerequisites to formation of a contract or prerequisites to an obligation to perform under an existing agreement is controlled by the intent of the parties." Id. Viewing the evidence in the light most favorable to Plaintiff, there was no contract formed prior to Ms. Tate's efforts to mail the check on October 18, 1999, and the parties' intentions as to the effect that such mailing would have on the coverage date were unclear until after the check had been mailed.

Moreover, there is a conflict in the evidence as to the precise terms of any agreement that was reached in the late afternoon of October 19, 1999. Viewed in the light most favorable to Defendants, the evidence might support a reasonable inference that coverage effective on October 18, 1999 was bound as soon as Ms. Tate (or her agent) mailed the check and faxed the signed application and finance agreement forms to Ms. Wright. On the other

hand, the evidence viewed in the light most favorable to Plaintiff supports a reasonable inference that coverage could not become effective until all the required paperwork was submitted (including a "no loss" statement for any retroactive coverage dating to October 18, 1999), or until the date and time indicated on the postmark for the envelope containing the check (2:45 p.m. October 19, 1999).

Finally, the Court is unpersuaded by the Personal Representatives' argument that the time of day on the postmark should be disregarded for purposes of ruling on the summary-judgment motions. Undoubtedly, there are rules of construction of which courts may avail themselves to resolve ambiguities that arise when the time of day becomes an operative fact and the policy in question fails to specify the hour at which coverage begins or ends. See, e.g., Surbaugh v. Stonewall Cas. Co., 283 S.E. 2d 859, 860-61 (W. Va. 1981). It is not unusual, however, for automobile insurance policies to specify the time of day when coverage begins or ends. See generally 7 Russ & Segalla, supra, § 102:16, at 102-41. In this case, Defendant Tate or his agent(s) chose a method of express mailing that provides a specific time of day on the postmark. Thus, it is unnecessary for the Court to resort to rules of construction. The date and time on the postmark, combined with the other evidence in Plaintiff's favor, is sufficient to preclude summary judgment for Defendants.

In sum, the Court cannot grant summary judgment in either side's favor at this point because Plaintiff and the Personal Representatives dispute key elements of the factual basis for one another's theories. Resolving the disputed factual issues concerning the substance and effect of Ms. Tate's conversations with Ms. Wright, as well as Ms. Wright's

conversations with Ms. Schippers, will require the factfinder to weigh the evidence and assess the credibility of witnesses. These tasks are beyond the scope of the Court's limited role in ruling on a motion for summary judgment. See Hunt, 526 U.S. at 551-52.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that there exist disputed issues of material fact which require the denial of Plaintiff's motion for summary judgment and the denial of the cross-motion for summary judgment filed by the Personal Representatives.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. No. 62] is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment by Defendants Valdez and Salazar [Doc. No.73] is **DENIED**.

**SO ORDERED**, this 27th day of September, 2002, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge